### ADOPTION OF NORBERT
### (and a companion case[1]).

No. 12-P-651.

Worcester. October 11, 2012. - April 25, 2013.

Present: GRAHAM, VUONO, & HANLON, JJ.

*Adoption,* Dispensing with parent's consent. *Minor,* Adoption. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Due Process of Law,* Adoption. *Judge. Practice, Civil,* Adoption, Disqualification of judge, Questioning of witness by judge.

A Juvenile Court judge did not err in not recusing himself from presiding over the trial of care and protection petitions, where, although some of the judge's comments at an earlier hearing were excessively critical and inappropriate, the record did not disclose any bias or prejudice against the mother. [543-546]

At the trial on care and protection petitions, although the judge's questioning of witnesses went beyond what was called for in the circumstances, his behavior, when considered in the context of the entire trial, did not deprive the mother of impartial justice, in that the outcome of the trial would not have been different had the judge not intervened. [546-548] HANLON, J., dissenting.

PETITIONS filed in the Worcester County Division of the Juvenile Court Department on November 14, 2008, and June 30, 2010.

After consolidation, the cases were heard by *George F. Leary,* J.

*Mark A. Papirio* for the mother.

*Brian R. Pariser* for Department of Children and Families.

*S. Michael Fournier* for the children.

VUONO, J. The mother appeals from decrees entered in the Juvenile Court terminating her parental rights as to her son, Norbert, and her daughter, Monica, and dispensing with her consent to their adoption.[2] She argues that the decrees should be vacated because the judge was biased and her right to due

---

[1]Adoption of Monica. Both names are pseudonyms.

[2]Norbert was born in December, 2007, and was three years old at the time of trial. Monica was born in April, 2009, and was two years old at the time of trial.

process was violated by the judge's extensive questioning of her and other witnesses throughout the trial. We affirm.

*Background.* Because the mother does not challenge the judge's findings, including the ultimate finding of her parental unfitness, we provide only the necessary background. On November 14, 2008, and June 30, 2010, the Department of Children and Families (department) filed petitions alleging that Norbert and Monica were in need of care and protection. After six nonconsecutive days of trial and consideration of numerous exhibits and reports, the judge issued decrees that permanently committed the children to the custody of the department and terminated the mother's parental rights. The judge, in his findings of fact and conclusions of law, all of which were amply supported by the evidence, found that the mother suffered from chronic untreated mental health issues and lacked insight into her parenting deficiencies. During the time the children were in the mother's custody, they were frequently exposed to domestic violence. In addition, the mother often acted inappropriately. For example, on at least one occasion, the mother invited a stranger whom she met on a telephone date line into her home for a sexual encounter while the children were present. Furthermore, the mother missed numerous visits with her children when they were in the custody of the department. At one point, she did not see Norbert for eight months. She was not receptive to the services offered by the department and often refused to work with the social workers assigned to her case. The judge did not order postadoption visitation because, as he stated, "[n]o evidence exists that the children enjoy visiting with the mother or receive any benefit from contact with her."[3]

*Discussion.* a. *Recusal.* The mother argues that the judge erred by not recusing himself from presiding over the trial on the department's care and protection petitions. Her claim is based on comments the judge made during a status hearing on September 16, 2009. At that time, the department had removed Norbert from the mother's custody, but had not initiated proceedings to remove Monica, who was four months old. The judge expressed frustration over the fact that the department was seeking to remove one child but not the other. The judge

[3]The mother does not raise any issues concerning this portion of the decrees.

pointedly reminded the department of its obligations and went on to voice his opinion that the department's position was "beyond comprehension." At the conclusion of the hearing, the judge filed a report under G. L. c. 119, § 51A (§ 51A report), against the department based on the fact that "the department's clinical approach to the case is confusing." The department subsequently removed Monica from her mother's care, but she was returned soon thereafter. Within a few months, however, another § 51A report was filed and the department regained custody.[4] The children were never returned to the mother after that point.

The mother argues that it was inappropriate for the judge to preside over the trial after having initiated the filing of a § 51A report based on the department's handling of its investigation of her care of her children. However, the mother did not file a motion requesting that the judge recuse himself. The children's father, whose parental rights were terminated following a separate trial before the same judge, did file a motion seeking recusal, which was denied. The mother asserts that she joined the father's motion, but there is nothing in the record to support her claim. There is no dispute, however, that the mother failed to raise the issue at trial, and the judge, therefore, did not address the issue of recusal with respect to the mother.[5]

---

[4]The report was filed by a department social worker who observed a strange man in the process of dressing himself when she arrived to pick up Norbert after an unsupervised visit. The mother claimed that the man was a neighbor, but did not know his name. In addition, Monica and Norbert appeared dirty and there was a lack of food in the house.

[5]The record indicates that the judge addressed the father's motion for recusal on two occasions. Initially, the motion was discussed at a pretrial conference on January 25, 2010. At that time the judge stated, "the basis for recusal has to be one of two things, either the judge has obtained information about the case from outside the courtroom, meaning, like, I witnessed something on the street or a feeling on my part that I would be unable to judge fairly the case, which I don't think that either instance applies here, so the motion to recuse is denied." The judge went on to note that, as a practical matter, it was unlikely that he would be the trial judge. Nonetheless (and even though he had denied the motion), the judge reserved the right to assign the case to another judge. He then repeated the fact that he could fairly decide the case and stated, "I don't want to create the impression on the record that I feel I will be unable to fairly decide this case." The issue was raised again at a hearing held on July 14, 2010, but the mother has not provided us with a transcript of that hearing. In her brief the mother claims that there was no audio recording of that hearing and therefore no transcript is available.

We first address the timeliness of the mother's claim. The children argue that we should not consider the issue of recusal because it was not raised in the Juvenile Court and no exceptional circumstances are present that would permit us to address it. "Generally, issues not raised by a losing party in the trial court are not addressed on appeal, absent exceptional circumstances." *Adoption of Mary*, 414 Mass. 705, 712 (1993). See *Petition of the Dept. of Soc. Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 697 (1984) ("[a]s a general practice we do not consider issues, particularly constitutional questions, raised for the first time in this court").

There is no doubt that the mother had an affirmative obligation to seek recusal "at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification." *Demoulas* v. *Demoulas Super Mkts., Inc.*, 428 Mass. 543, 549 (1998), *S.C.*, 432 Mass. 43 (2000) (citation omitted). Here, the mother was aware of the basis of her claim almost two years before trial, and while she claims to have joined the father's motion to recuse, she has not offered any reason for her failure to raise the issue at trial. These circumstances provide support for the children's assertion that the claim is waived. See *Adoption of Darla*, 56 Mass. App. Ct. 519, 522 (2002). However, given the serious nature of the case, coupled with the fact that due process governs these proceedings, we believe that it is appropriate to consider the issue even though the claim is untimely. See *Demoulas* v. *Demoulas Super Mkts., Inc., supra* at 550; *Matter of a Care & Protection Summons*, 437 Mass. 224, 239 (2002) (belated request for recusal "suggests a tactical decision in the face of an adverse ruling").

We have conducted a careful review of the entire record and conclude that recusal was not warranted on the basis of the judge's conduct at the status hearing. While we acknowledge that some of the judge's comments were excessively critical and inappropriate, we are not persuaded that the record discloses any bias or prejudice against the mother.[6] Under Canon 3(E)(1)(a) of the Code of Judicial Conduct, S.J.C. Rule 3:09, as appearing in

---

[6]At one point in the hearing, while addressing the department's inaction concerning Monica, the judge stated: "[I]f a parent cooks a baby for Thanksgiving, you don't have to wait until she puts the next baby in the oven before

440 Mass. 1319 (2003), "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where . . . the judge has a personal bias or prejudice *concerning a party* . . . ." See *MacDonald* v. *MacDonald*, 407 Mass. 196, 203 (1990). Here, it is clear that the judge's ire was directed at the department and not toward either parent. The mother has also failed to show that any alleged bias stemmed from an extrajudicial source. See *Matter of a Care & Protection Summons*, 437 Mass. at 239-240 ("[n]ot subject to deprecatory characterizations as 'bias' or 'prejudice' are opinions held by judges as a result of what they learn in earlier proceedings"). In sum, it has not been shown that the judge should have recused himself.

b. *The judge's questioning of the witnesses.* We now turn to the mother's assertion that the judge impermissibly interfered with the conduct of the trial by participating — almost to the exclusion of the attorneys — in examination of the witnesses. Relying on *Adoption of Seth*, 29 Mass. App. Ct. 343, 350 (1990), the mother argues that the judge's conduct denied her the impartial justice to which she is entitled.

There is no question that the judge assumed an active role and extensively questioned all the witnesses including the mother. Our review of the record shows that the judge asked over 1,000 questions as compared to the approximately 725 questions asked by counsel for the department, the mother, and the children combined. The mother's attorney did not object to the judge's conduct. Because the transcript cannot disclose the tone of the judge's voice or his manner in asking questions, it is difficult for us to assess the mother's claim that the judge acted aggres-

---

you decide to intervene." The remark was clearly unwise and, even viewed in context, raises legitimate concerns. However, to the extent that the judge's comments indicated a concern over the mother's ability to care for Monica, they were tempered by his explicit concern for the mother and the fact that there might not be a sufficient basis for the department to retain custody of Norbert. As an example, during one exchange with the department's attorney, the attorney explained that the department did not have a reason "to pull the four month old [Monica]." The judge responded "You don't have a reason to pull the four month old. Then give [the mother] back [Norbert] because you don't have a reason to hold [him] either." The judge went on to make the point that if the department was not concerned about Monica then "[the mother was] entitled to have [Norbert] back now."

sively toward her. Thus, we view the lack of an objection by counsel as particularly significant in this case.

Our cases permit a judge, who in these types of cases is the fact finder, to question witnesses in order to obtain clarification or eliminate confusion. "In exercising their duty to direct and clarify the evidence, judges may not, however, weigh in, or appear to do so, on one side or the other; the judge must avoid the appearance of partisanship. . . . The rule is one of reason." *Commonwealth* v. *Hassey*, 40 Mass. App. Ct. 806, 810 (1996). In determining what is reasonable, "[w]e are not unmindful of the observation of Francis Bacon on the 'overspeaking judge,' and we have not favored except in extenuating circumstances the takeover of questioning by a judge during the course of trial." *Commonwealth* v. *Campbell*, 371 Mass. 40, 45 (1976).

While we agree with the mother that the judge's questioning went beyond clarification and delved into substantive areas that would have best been left to the attorneys to develop, a close reading of the transcript does not demonstrate that she was denied due process. The judge did not limit the mother's attorney from questioning the department's witnesses. The mother was not prevented from presenting relevant evidence. Nor did the judge solicit any inadmissible evidence.[7] Thus, although the judge's questioning went beyond what was called for in the circumstances, we conclude that his behavior, when considered in the context of the entire trial, cannot be deemed to have deprived the mother of impartial justice.

In reaching our conclusion, we emphasize that we do not condone the conduct of the judge in this case. In this respect we agree with the dissent. The relevant inquiry, however, is whether the error was prejudicial.[8] For us, the crucial question, which the dissent acknowledges but fails to address, is whether the

---

[7] We are not persuaded by the mother's argument that the judge's questions caused the mother to comment upon the credibility of other witnesses. Instead, we view the questions at issue as an attempt to understand the basic facts of the case.

[8] Like any child who is the subject of a care and protection proceeding, the children in this case are entitled to permanency. The record indicates that Norbert and Monica have resided together in a preadoptive home since May 13, 2011. It would be unfortunate, to say the least, if we were constrained to vacate the decrees as a result of judicial overreaching.

outcome of the trial would have been different had the judge not intervened. Because the record contains ample support for the judge's detailed (and uncontested) findings, which, in turn, unequivocally support the judge's determination that the termination of parental rights serves the best interests of the children, we conclude that the error was harmless. See *Adoption of Seth*, 29 Mass. App. Ct. at 351 (if the judge was "overzealous" in the questioning of the psychiatrist, the error was harmless in view of the conclusion that no prejudice resulted). Given our confidence that the outcome of the proceedings in this case would not have been different, despite our criticism of the judge's conduct, we affirm the decrees.

*Decrees affirmed.*

HANLON, J. (dissenting). I respectfully dissent. The majority opinion clearly and accurately lays out the relevant facts and case law; I have little to add to either. Nonetheless, I cannot join the majority's conclusion that this mother was not denied "impartial justice."

The trial judge's frustration with the Department of Children and Families is understandable. Faced with a request to remove an eleven month old child from the mother while leaving a four month old child in her care — and no explanation for the different positions — the judge spelled out his concern to the attorneys. Receiving no adequate response, he then, pursuant to G. L. c. 119, § 51A, ordered an investigation of the circumstances surrounding the mother's care of the four month old.[1] I have no quarrel with that, and I agree that there was no error in denying the recusal motion.[2] However, given that history, it was particularly important for the judge to conduct the hearing on the termination of the mother's parental rights with some care, paying scrupulous attention to providing her with a fair trial.

This, he failed to do. As the majority points out, it is often

---

[1]The care and protection petition that was filed was dismissed, and the child returned to the mother. Eventually, proceedings involving both children were consolidated for trial in the present case.

[2]I agree with the majority, however, that the judge would have been wise to express his frustration more temperately.

necessary for a trial judge to ask questions in order to elicit crucial information. This is particularly true in a case where the safety of children is at stake. In this case, however, the judge asked more than 1,000 questions, compared to 725 for the four attorneys combined; more importantly, his questions, particularly those posed to the mother, do not seem designed to seek information. On the contrary, they look very much like an effective cross-examination by a skillful adversary. The following exchange, from early in the trial, captures the flavor of the entire proceeding:

THE COURT: "[A]nswer the question. Did you not visit with [your son] for those eight months you were in Florida?"

THE WITNESS: "No."

COUNSEL FOR MOTHER: "When you say 'no,' what do you mean?"

THE WITNESS: "I was in Florida and, as I had said before, my doctors told me, due to medical reasons, they advised me it wouldn't be a good idea for me to travel in my condition."

THE COURT: "What was your medical —"

COUNSEL FOR CHILDREN: "Objection. Move to strike."

THE COURT: "Overruled. What was your medical condition?"

THE WITNESS: "My pregnancy to [my daughter] at the time. And, of course, towards the end, they didn't really want me to be leaving, you know, the state because they already had something set up to do the C-section for [my daughter] and it was advised at the time —"

THE COURT: "So you missed eight — what were you getting for visits? Once a month?"

THE WITNESS: "I think so."

THE COURT: "So you missed eight visits with the child? . . . Do you think that had any impact on the child?"

THE WITNESS: "I'm sure it did at that point."

THE COURT: "What kind of impact — do you think that it had a lasting impact?"

THE WITNESS: "Yes."

THE COURT: "What kind of impact do you think it had on the child?"

THE WITNESS: "Not a very good one. I felt bad for him every day, you know."

THE COURT: "So do you acknowledge, then, that it was harmful for the child not to see you for those eight months?"

THE WITNESS: "Yeah, but can I say, um, that I tried to work on the interstate compact plan, which I felt was the best thing."

THE COURT: "Well, that would have been getting the child down in Florida?"

THE WITNESS: "Yeah."

THE COURT: "Did that interstate compact plan get approved?"

THE WITNESS: "I guess [the social worker] can reflect on that."

THE COURT: "Well, I'll ask you. Did it get approved?"

THE WITNESS: "I don't remember how that went."

THE COURT: "In any event —"

THE WITNESS: "It took a long time to get it to go through."

THE COURT: "[T]he child never went to Florida?"

THE WITNESS: "No, he never had."

THE COURT: "Proceed, counsel."

After the mother's attorney asked two questions, the judge took over the questioning again; he proceeded to question the witness, virtually uninterrupted,[3] for the next twelve pages of transcript. Some of his questions during this part of the hearing seem, at least in hindsight, particularly unfair. For example, the judge asked the mother if her husband had a criminal record and, when she said, "Not that I even knew of," he asked her if she had checked.[4]

---

[3]The children's attorney interrupted once, saying that she could not hear the answer.

[4]In addition, the judge questioned the mother extensively — for pages of transcript — about whether she had seen signs of violence or "an anger management problem" in her husband before he assaulted her after her second child was born. The clear implication in the tone of the questioning was that she was either lying about the history of violence in her relationship or

This case is very different from *Commonwealth* v. *Campbell*, 371 Mass. 40, 44-45 (1976), on which the majority relies. In that case, "it appear[ed] that in questioning [the witness] some 1,725 questions were asked by counsel, with an additional eighty-five being asked by the judge. Reference [was] also made to another witness of whom the judge asked some twenty-five questions, with counsel asking a total of 901." *Ibid.* Here, as the majority notes, the judge asked more than one-third again as many questions as all four of the attorneys combined. In addition, unlike the majority, I discern, even in a bare transcript, a tone in the judge's questioning that can be described fairly as "aggressive." The majority points out that there was no objection by mother's counsel. However, failure to object to the *judge's* questions, or to the manner in which he conducted the trial, cannot carry the same implication of acquiescence as a failure to object to the questions of opposing counsel. See *Commonwealth* v. *Ragonesi*, 22 Mass. App. Ct. 320, 322 n.4 (1986) ("It should be apparent to anyone who reads the transcript that the judge would not have tolerated any further objection").

These cases are among the most challenging a trial judge can hear; they often present with heartbreaking facts, prompting well-founded concerns for children's safety. "A judge has the right and in some circumstances, the duty to *participate* in the examination of a witness. *Commonwealth* v. *Festa*, 369 Mass. 419, 422 (1976)" (emphasis supplied). *Adoption of Seth*, 29 Mass. App. Ct. 343, 351 (1990). It is also true that sometimes counsel could be more effective. However, in this case, the *attorneys* were given little opportunity to participate. This judge repeatedly interrupted each examination, and frequently the questions and answers themselves, often to make, or to reinforce, a point of his own. This is unacceptable. It contributes neither to the truth-seeking process nor to the perception of fundamental fair-

neglectful when she got married, because she had not noticed warning signs. Either, or both, of those things may be true. However, the literature on domestic violence is replete with examples of episodes of violence that first appeared only after the relationship had been established. See, e.g., Browne, When Battered Women Kill (McMillan Free Press 1987) ("Typically — in 72 percent to 77 percent of the cases — violence occurs only after a couple has become seriously involved, is engaged, or is living together; rather than in the early, more casual states of dating. Victims have difficulty interpreting assaultive behavior from someone they thought they knew so well").

ness that is essential if litigants and the public are to have confidence in our system of justice.[5]

Despite her considerable shortcomings, this mother was entitled to a fair trial, with representation by counsel and an opportunity to present her side of the story. On this record, I cannot say that she received one. And, under all of the circumstances, I cannot agree to uphold the termination of her parental rights simply on the ground that a fair trial might produce the same result.

---

[5]This court has addressed this issue previously with this judge in an unpublished opinion issued pursuant to rule 1:28. See, e.g. *Adoption of Nurit*, 71 Mass. App. Ct. 1104 (2008) ("In this case, the judge asked approximately 2,925 questions as compared to the 2,623 questions asked by . . . all four trial counsels for the department, mother, father, and children. The number of questions asked by the judge was substantial, and we think that the better practice would have been to leave questioning to the parties' attorneys").